PER CURIAM.
¶1 Derrick Brown, pro se, appeals a circuit court order that affirmed a prison disciplinary decision. Brown contends that: (1) the evidence was insufficient to support the finding that Brown used an intoxicant; (2) the disciplinary proceedings violated Brown's due process rights to present evidence and to an impartial hearing officer; and (3) restitution was ordered in violation of Brown's rights to notice and to an opportunity to be heard. We conclude that the evidence was sufficient to support the finding of guilt and that Brown was afforded his rights to present evidence and to an impartial hearing officer. However, we also conclude that Brown's rights to notice and to an opportunity to be heard on restitution were violated. Accordingly, we affirm in part and reverse in part.
¶2 In March 2016, prison staff issued Brown a conduct report charging him with using an intoxicant. The conduct report writer stated that prison staff responded to Brown having an unknown health emergency, and observed Brown making growling sounds and foaming at the mouth. Brown admitted that he had taken two pills. Brown was taken to the hospital for medical aid and monitoring.
¶3 A disciplinary hearing was held on April 19, 2016. Brown denied using an intoxicant. The responding nurse testified that Brown had exhibited symptoms that she believed were consistent with a drug overdose or use of a hallucinogenic drug, and not consistent with a seizure. She testified that she had observed that Brown had vomited, appeared sweaty, had foam around his mouth, exhibited a wild stare, and had urinated on himself. She also testified that Brown admitted he had taken two pills, and that he was able to answer questions but would then continue talking without making sense. The conduct report writer submitted written answers to questions stating that the writer had observed Brown lying on the ground, making growling sounds, with white foam around his mouth. The report writer stated that Brown did not have control over his body and appeared disoriented. The report writer asked Brown if he had taken anything and Brown nodded in the affirmative. The report writer stated that prison staff believed that Brown was under the influence of the synthetic drug "K2," but they did not know what he had ingested.
¶4 Brown submitted his own statement and other evidence in his defense. Brown's evidence included toxicology reports indicating that testing of specimens collected from Brown at the hospital on March 18, 2016, and of a specimen collected from Brown at the prison on March 20, 2016, produced negative results.
¶5 The hearing committee found Brown guilty of using an intoxicant. It stated that it accepted all documents submitted by Brown as evidence. It explained that the hearing officer had contacted the drug laboratory and received information that testing for synthetic cannabinoids will not produce a positive result if the sample is taken within twenty-four hours of ingestion because the chemicals will not have entered the bloodstream. The committee stated that all of the urine and blood samples tested were collected from Brown prior to the end of the twenty-four hour period. It also found that Brown's symptoms had been consistent with synthetic cannabinoid use. The hearing committee imposed sixty days of disciplinary separation. The Department of Corrections (DOC) later issued an order for Brown to pay $ 2,480.81 in restitution for off-site medical care.
¶6 Brown pursued relief from the disciplinary decision through the prison administrative review system. When those attempts proved unsuccessful,[1] Brown filed a petition for certiorari review in the circuit court. The court denied the petition. Brown appeals.
¶7 In an appeal of a circuit court order affirming a prison disciplinary decision, we review the prison disciplinary decision of the DOC rather than the decision of the court. State ex rel. Anderson-El, II v. Cooke , 2000 WI 40, ¶15, 234 Wis. 2d 626, 610 N.W.2d 821. Our review is limited to the following: (1) whether the DOC acted within its jurisdiction; (2) whether the DOC acted according to law; (3) whether the DOC's actions were arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that the DOC might reasonably have made its decision. Id. ; see also State v. Swiams , 2004 WI App 217, ¶21, 277 Wis. 2d 400, 690 N.W.2d 452.
¶8 Brown argues that the evidence was insufficient to support the finding that Brown had used an intoxicant.[2] He points to the following: (1) hospital notes indicating that Brown exhibited symptoms consistent with having had a seizure; (2) Brown's statement that when he admitted to taking two pills, he was referring to having taken Tylenol as prescribed; and (3) that Brown's drug tests all came back negative. However, none of that evidence renders the evidence insufficient to support the committee's finding of guilt. In addition to the evidence cited by Brown, the committee also heard testimony from the responding nurse, who described Brown's symptoms and stated that they were consistent with a drug overdose or use of a hallucinogenic drug and that Brown had admitted to taking two pills, as well as corroborating observations from the conduct report writer. That evidence was such that the hearing committee could have reasonably found that Brown had used an intoxicant, even if it would have supported another decision as well.[3] See Von Arx v. Schwarz , 185 Wis. 2d 645, 656, 517 N.W.2d 540 (Ct. App. 1994) ("If substantial evidence supports the [DOC's] determination, it must be affirmed even though the evidence may support a contrary determination. Substantial evidence is evidence that is relevant, credible, probative, and of a quantum upon which a reasonable fact finder could base a conclusion." (quoted source omitted)).
¶9 Brown asserts that the DOC prevented him from presenting a defense by refusing to consider the second drug test results. See Wolff v. McDonnell , 418 U.S. 539, 563-65 (1974) (minimum due process requirements at prison disciplinary proceedings include the right to present a defense). He asserts that, while the hearing committee stated that it accepted and considered all evidence that Brown submitted, the second drug test results were not stamped "evidence submitted by inmate" like the rest of Brown's evidence. Brown points out that, in its decision, the committee states that "[a]ll toxicology tests given to Brown were negative at the time blood sample was taken, which was ... on 3/18/16," and that "[a]ll of Brown's urine and blood samples were submitted prior to a 24 hour time period." Brown points out that the blood and urine for the first drug test was collected at the hospital on March 18, 2016, but that the urine for the second drug test was collected on March 20, 2018.[4] He asserts, therefore, that the committee did not accept and consider the second drug test report.
¶10 However, the committee stated that it considered all evidence submitted by Brown, and the second drug test is included with that material. Additionally, the committee specifically referenced the second drug test when it listed the evidence submitted by Brown. The committee explained why it was not persuaded by the results of the first drug test, which was conducted with blood and urine collected at the hospital. While the committee did not specifically state why it was not persuaded by the results of the second drug test, it does not follow that the committee refused to consider that evidence. Rather, the committee's decision indicates that the committee considered the results of the drug testing and determined that, despite the negative results, the other evidence that Brown had used an intoxicant supported a finding of guilty.
¶11 Brown also argues that the DOC prevented him from presenting a defense by rejecting a question Brown submitted to the report writer as to the results of the second drug test. See Wolff v. McDonnell , 418 U.S. at 563-65. Brown asserts that the report writer's answer would have been that the drug test result was negative. Brown asserts that that answer would have undermined the report writer's answer to another question that, at the time of Brown's transport to the hospital, prison staff believed that Brown was under the influence of K2. It appears that Brown believes that the answers would have been in conflict, and would have undermined the report writer's credibility. We disagree. First, as set forth above, the second toxicology report was accepted by the committee as evidence, and therefore Brown's question to the report writer was not necessary for Brown to present evidence of the results of the testing. Second, the fact that later drug tests were negative does not contradict the officer's belief, at the time of Brown's transport to the hospital, that Brown was under the influence of a drug. We discern no deprivation of the right to present a defense on this basis.
¶12 Brown also argues that, under Meeks v. McBride , 81 F.3d 717, 720 (7th Cir. 1996), the hearing committee was required to explain why it disregarded the negative drug test results. The Meeks court held that "where a prison inmate produces exculpatory evidence that directly undermines the reliability of the evidence in the record pointing to his guilt, 'he is entitled to an explanation of why the disciplinary board disregarded the exculpatory evidence and refused to find it persuasive.' " Id. (quoted source omitted). Brown contends that, here, the hearing committee's only explanation for disregarding the test results was that the testing for synthetic drugs would not have shown a positive result for synthetic drugs ingested within twenty-four hours. Brown contends that the committee was mistaken as to the timing of the collection of the second sample at the prison, and that the testing at the hospital was not limited to synthetic drugs only. However, the negative test results did not directly undermine the reliability of the observational evidence indicating that Brown had used an intoxicant. Brown did not establish that the drug tests excluded the possibility that he had ingested any intoxicant that caused the symptoms observed by prison staff and at the hospital. While the negative test results could have caused the hearing committee to reach a different result, they did not compel that decision. As the Meeks court also explained, "we do not consider exculpatory evidence merely because it could have supported a different result from that reached by the [committee]." Id.
¶13 Brown argues that he was denied his due process right to an impartial hearing officer. See Jackson v. Buchler , 2010 WI 135, ¶74, 330 Wis. 2d 279, 793 N.W.2d 826 ("Inmates are entitled to an impartial adjustment committee in disciplinary hearings to prevent 'such a hazard of arbitrary decisionmaking that it should be held violative of due process of law.' " (quoted source omitted)). He contends that the hearing officer's bias was exhibited by: (1) her rejection of Brown's question to the conduct report writer about the results of the second drug test; (2) her deeming irrelevant another officer's testimony that a hospital nurse stated that the conduct report writer had called the hospital and reported that another inmate had given Brown K2; and (3) her statement that all of the blood and urine samples were collected from Brown within twenty-four hours, when the urine sample collected at the prison was taken more than twenty-four hours after the sample collected at the hospital.[5] However, nothing Brown cites indicates that the hearing officer had predetermined the matter or that she was not impartial. The hearing officer's assessment of the evidence contrary to Brown's defense does not establish bias.
¶14 Brown also contends that the hearing officer was substantially involved in the incident by conducting her own investigation into the reliability of testing for, and the effects of, synthetic drugs. See WIS. ADMIN. CODE § DOC 303.79(3) (March 2019) ("No person who has substantial involvement in an incident, which is the subject of a hearing, may serve on the committee for that hearing."). Brown points to the hearing officer's contacting the laboratory for information as to drug testing results and her reliance on the Center for Disease Control's description of the symptoms of synthetic cannabinoid use. However, those actions do not amount to involvement in the incident in this case, which was Brown's alleged use of an intoxicant and subsequent medical distress and transport to the hospital. Brown has not pointed to any action by the hearing officer as to that event.
¶15 Finally, Brown contends that the DOC improperly imposed restitution without providing Brown the opportunity to dispute restitution at a hearing. See Wolff , 418 U.S. at 563-65 (to satisfy minimum due process requirements, a prisoner must be afforded notice and the opportunity to present a defense). The State concedes this point. Because it is undisputed that the DOC improperly imposed restitution, we reverse the order imposing restitution. The DOC shall refund to Brown any amount already collected from Brown under the restitution order.
¶16 For the foregoing reasons, the order of the circuit court is affirmed in part and reversed in part.
By the Court. -Order affirmed in part and reversed in part.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5. (2017-18).

In Brown's appeal to the warden, the warden modified the committee's finding of guilty of use of an intoxicant to fall under Wis. Admin. Code § DOC 303.60(1) (March 2019), instead of subsection (2), because subsection (2) requires a positive drug test.

In his reply brief, Brown asserts that the warden's modification of the committee's finding of guilt to Wis. Admin. Code § DOC 303.60(1), instead of subsection (2), precludes the committee's reliance on their observations of Brown to support a finding of guilt. He asserts that those observations would only be relevant to a "physical examination" under subsection (2). However, nothing in the code prohibits the committee from relying on reports of observations of an inmate to support a finding that the inmate is guilty of using an intoxicant under subsection (1).

Brown also contends in reply that testing was needed to determine whether he had taken Tylenol as alleged, and also that the State cannot argue that the drug tests were not conclusive when, in other cases, the DOC relies on positive drug test results for findings of guilt. As to the Tylenol use, Brown does not explain how test results on Brown's use of Tylenol would have been relevant to whether Brown also ingested an intoxicant. As to the drug test results, we are not persuaded that the negative results in this case prove that Brown had not used any intoxicant in the same way that a positive result establishes that an inmate did use an intoxicant. That is, a negative result here would not have ruled out the presence of intoxicants not included in the drug screening or that took longer to be absorbed in the bloodstream, while a positive test result generally establishes that an inmate did, in fact, ingest an intoxicant.

It appears that the first toxicology test was done on blood and urine samples collected from Brown at the hospital on March 18, 2016. The second drug test was done on a urine sample collected from Brown at the prison on March 20, 2016. The committee stated that "all" of the blood and urine samples were collected within twenty-four hours in connection with its statement that testing of samples taken within twenty-four hours would not show a positive result for synthetic cannabinoids because the chemicals would not have entered the bloodstream. The committee apparently was referring to only the samples collected at the hospital (which apparently included blood and urine samples) and not to the sample taken at the prison (which was a urine sample only) when it stated that "all" of the blood and urine samples were taken within twenty-four hours.

Brown also contends that the hearing officer's bias was exhibited by her meeting with Brown prior to the hearing and discussing the dangers of K2. However, Brown does not cite to anything in the record indicating that that meeting occurred.